IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEROME CLAY,

     Plaintiff,                    No. 2:12-cv-2027 JAM KJN PS

     v.

AT&T COMMUNICATIONS OF
CALIFORNIA, INC. et al.,

     Defendants.               FINDINGS AND RECOMMENDATIONS

/

       This action to recover unpaid "wages" was originally filed by plaintiff Jerome Clay as a small claims court case in the San Joaquin County Superior Court on July 11, 2012. (Dkt. Nos. 1-2, 1-3.) Subsequently, on August 2, 2012, defendants Pacific Bell Telephone Company ("Pacific Bell") (erroneously sued as AT&T Communications of California, Inc.) and Sedgwick Claims Management Service, Inc. ("Sedgwick") removed the action to this court, invoking the court's federal question jurisdiction under 28 U.S.C. § 1331. (Dkt. No. 1.)[1] More specifically, defendants contend that plaintiff's action for unpaid "wages" is essentially an action to recover short-term disability ("STD") benefits under his employer's welfare benefits plan, which is covered by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.

---

[1] This case proceeds before the undersigned pursuant to E.D. Cal. L.R. 302(c)(21) and 28 U.S.C. § 636(b)(1).

1

1  ("ERISA"). (Id.) As such, defendants claim that the federal courts have exclusive jurisdiction
2  over plaintiff's claim. Plaintiff proceeds in this action without counsel.

3  Presently pending before the court is plaintiff's motion to remand the action to
4  state court, and for an award of attorneys' fees and costs, originally noticed for hearing on
5  September 20, 2012. (Dkt. No. 10.) On August 30, 2012, defendants filed an opposition to the
6  motion. (Dkt. No. 11.) Thereafter, on September 18, 2012, the court rescheduled the hearing on
7  plaintiff's motion for October 18, 2012, and ordered defendants to file supplemental briefing
8  addressing the question of whether payment of STD benefits under the benefits plan at issue is a
9  "payroll practice" exempt from ERISA's coverage under 29 C.F.R. § 2510.3-1(b)(2). (Dkt.
10 No. 12.) On September 27, 2012, defendants filed a supplemental opposition to plaintiff's
11 motion to remand, and on October 10, 2012, plaintiff filed a reply to defendants' supplemental
12 opposition. (Dkt. Nos. 13, 17.)

13 At the October 18, 2012 hearing, plaintiff represented himself, and attorneys
14 Katherine Kettler and Michael Nave appeared on behalf of defendants. (Dkt. No. 18.) After
15 conferring with the parties at the hearing, the court on October 19, 2012, ordered defendants to
16 file a supplemental declaration(s) within fourteen (14) days to further clarify certain aspects of
17 STD benefits payments, including identifying the source from which the STD benefits are
18 initially paid. (Dkt. No. 19.) The court also permitted plaintiff to file a response to defendants'
19 supplemental declaration(s) within seven (7) days of service of the declaration(s). (Id.) On
20 November 1, 2012, defendants filed three supplemental declarations pursuant to the court's
21 order. (Dkt. Nos. 20-22.) On November 14, 2012, plaintiff filed a responsive declaration. (Dkt.
22 No. 23.)

23 After considering the parties' briefing, the parties' oral argument, and appropriate
24 portions of the record, the undersigned recommends that plaintiff's motion to remand the action
25 to state court, and for an award of attorneys' fees and costs, be denied.
26 ////

BACKGROUND

Plaintiff's state court complaint merely alleges that defendants owe him $10,000 for "Violation of the Health Insurance Portability and Accountability, 'HIPA' Law."[2] (Dkt. No. 1-2 at 2; Dkt. No. 1-3 at 2.) Plaintiff claims that he went on state disability from February 6, 2012, until May 21, 2012, and that defendants refused to pay him his "wages" even though his doctor filled out the necessary papers for "claim #8331." (Id.)

In their notice of removal, briefing in opposition to plaintiff's motion to remand, and supporting declarations, defendants provide more details regarding the factual context of this dispute. According to defendants, plaintiff is an employee of Pacific Bell,[3] which is a wholly owned subsidiary of AT&T Teleholdings, Inc., which in turn is a wholly owned subsidiary of AT&T Inc. ("AT&T"). (Declaration of Dale Fender, Dkt. No. 14 ["Fender Decl."] ¶ 3.) Plaintiff, as an employee of a member of AT&T's family of companies, is covered by the AT&T Umbrella Benefit Plan No. 1 ("Umbrella Plan"), which is a comprehensive welfare benefit plan combining "certain funded group medical, supplemental group medical, dental, vision, prescription drug, life insurance, short-term and long-term disability and accidental death and dismemberment plans sponsored by an Employer (each a "Program") into one welfare benefit plan." (Id., Ex. A at 1.)

One of the components of the Umbrella Plan is the AT&T West Disability Benefits Program ("Disability Program"), which provides STD benefits, long-term disability benefits, and vocational rehabilitation benefits to eligible employees who become disabled and unable to work. (Fender Decl. ¶ 4, Ex. B at 6.) The employer pays the full cost of the Disability

---

[2] Although plaintiff's complaint makes reference to the federal Health Insurance Portability and Accountability Act ("HIPAA"), defendants do not premise federal question jurisdiction on any HIPAA claim. In any event, because HIPAA provides no private right of action, a violation of HIPAA cannot in itself serve as a basis for federal question jurisdiction. See Webb v. Smart Document Solutions, LLC, 499 F.3d 1078, 1081-83 (9th Cir. 2007).

[3] Defendants indicated that Pacific Bell, although apparently erroneously sued as AT&T Communications of California, Inc., has accepted service in this matter. (Dkt. No. 1 at 2.)

Program.  (Id.)  Sedgwick is the independent third-party claims administrator for the Disability Program.  (Dkt. No. 1 at 3; Declaration of Susan Hagestad, Dkt. No. 15 ["Hagestad Decl."] ¶ 1.)

According to the Disability Program's Summary Plan Description ("SPD"), STD benefits begin on the eighth consecutive day of absence from work due to an illness or injury and continue for up to 52 weeks.  (Employees may receive sick pay for the first seven days of an absence.)  (Fender Decl. Ex. B at 6; Declaration of Crystal Miller, Dkt. No. 21 ["Miller Decl."] ¶ 6.)  To be eligible for STD benefits, an employee must provide evidence that he or she suffers from "a sickness, injury or other medical, psychiatric or psychological condition that prevents you from engaging in your normal occupation or employment...."  (Fender Decl. Ex. B at 11.)  Sedgwick approves or denies claims for STD benefits in accordance with the terms of the Disability Program.  (Declaration of Carl J. Strutz, Dkt. No. 20 ["Strutz Decl."] ¶ 11.)  If STD benefits are approved, they replace 50% or 100% of the employee's pay during the disability period, depending on the employee's length of service with the employer and the duration of the disability leave.  (Fender Decl. Ex. B at 6.)[4]  However, STD benefits are offset or reduced by other specified sources of income, such as California state disability insurance ("SDI") and workers' compensation benefits, among others.  (Id. at 13-14; Miller Decl. ¶ 8.)  At the end of a 52-week period of STD benefits, an employee may be eligible for long-term disability benefits.  (Fender Decl. Ex. B at 6.)

Defendants assert that on February 13, 2012, plaintiff's supervisor reported a disability claim for plaintiff to the AT&T Integrated Disability Service Center ("IDSC"), which

---

[4] A chart in the SPD demonstrates that the longer an employee has worked for the employer, the greater the portion of the 52-week period for which the employee may receive 100% of his or her pay in STD benefits, assuming that the disability continues.  For example, an employee who has less than 2 years of service is entitled to 8 weeks of STD benefits at full pay and 44 weeks of STD benefits at half pay.  By contrast, an employee that has at least 20 years but less than 25 years of service is entitled to 39 weeks of STD benefits at full pay and 13 weeks of STD benefits at half pay.  (See Fender Decl. Ex. B at 12.)

is operated by Sedgwick. That claim was initially denied on March 5, 2012, and subsequent internal appeals were unsuccessful. (Hagestad Decl. ¶¶ 2-8.) As noted above, defendants contend that plaintiff's complaint concerns this claim for STD benefits, which they argue amounts to a claim for benefits under an ERISA plan over which this court has exclusive jurisdiction.

Although plaintiff's briefing is largely unintelligible, he appears to implicitly concede that the "wages" he is seeking are STD benefits. For example, plaintiff states in his motion to remand that "once he went out on State Disability, after Plaintiff provided proof from doctor he was unable to work [sic], Defendants were to pay wages to plaintiff based on years of services." (Dkt. No. 10 at 5.) In his supplemental reply brief, plaintiff also refers to the offsets from STD benefits allowed for other sources of income, for example, for any state disability payments he received, and argues that defendants were supposed to pay the difference. (Dkt. No. 17 at 3.) These assertions, combined with the fact that plaintiff named Sedgwick, the third-party claims administrator for the Disability Program, as a defendant, strongly suggests that the dispute involves plaintiff's entitlement to STD benefits.[5]

With this factual background in mind, the court turns to plaintiff's motion to remand.

DISCUSSION

In plaintiff's motion to remand, plaintiff first argues that defendants' notice of removal is procedurally flawed, because it does not set forth the basis for removal. See 28 U.S.C. § 1446(a). However, the notice of removal states that removal is premised on the court's federal question jurisdiction under 28 U.S.C. § 1331, which in turn is invoked based on

---

[5] Plaintiff vehemently argues that he "never exercised his rights under ERISA." (Dkt. No. 17 at 3.) However, despite the court's specific request, plaintiff has not identified any other payments, beyond mere vague allusions to "wages," to which he is allegedly entitled. (Dkt. No. 12 at 7 n.5.) Therefore, it seems clear that this action is for recovery of STD benefits under the Disability Program, whether or not the court ultimately determines that such payments are covered by ERISA.

5

defendants' characterization of plaintiff's complaint as purporting to state a claim for STD benefits under an ERISA plan. As such, it appears that defendants at least procedurally complied with 28 U.S.C. § 1446(a).

Plaintiff next argues that the court lacks subject matter jurisdiction over the action. In relevant part, the federal removal statute provides:

> (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). "The defendant bears the burden of establishing that removal is proper." Provincial Gov't of Marinduque v. Placer Dome, Inc., 582 F.3d 1083, 1087 (9th Cir. 2009). "The removal statute is strictly construed against removal jurisdiction," id., and removal jurisdiction "must be rejected if there is any doubt as to the right of removal in the first instance" Geographic Expeditions, Inc. v. Estate of Lhotka, 599 F.3d 1102, 1107 (9th Cir. 2010) (citation and quotation marks omitted).

Additionally, a federal court has an independent duty to assess whether federal subject matter jurisdiction exists, whether or not the parties raise the issue. See United Investors Life Ins. Co. v. Waddell & Reed Inc., 360 F.3d 960, 967 (9th Cir. 2004) (stating that "the district court had a duty to establish subject matter jurisdiction over the removed action *sua sponte*, whether the parties raised the issue or not"); accord Rains v. Criterion Sys., Inc., 80 F.3d 339, 342 (9th Cir. 1996). Because subject matter jurisdiction may not be waived by the parties, a district court must remand a case if it lacks jurisdiction over the matter. Kelton Arms Condominium Owners Ass'n, Inc. v. Homestead Ins. Co., 346 F.3d 1190, 1192 (9th Cir. 2003) (citing Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1211 (9th Cir. 1998)); see also 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded").

In regards to federal question jurisdiction, federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action, or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983); see also Republican Party of Guam v. Gutierrez, 277 F.3d 1086, 1088-89 (9th Cir. 2002). "[T]he presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  Placer Dome, Inc., 582 F.3d at 1091 (citation and quotation marks omitted).

While plaintiff correctly points out that the operative complaint here does not expressly assert an ERISA claim, that is not necessary when a claim is completely preempted by section 502(a) of ERISA. As the Ninth Circuit explained,

> [c]omplete preemption removal is an exception to the otherwise applicable rule that a plaintiff is ordinarily entitled to remain in state court so long as its complaint does not, on its face, affirmatively allege a federal claim...If a complaint alleges only state-law claims, and if these claims are entirely encompassed by § 502(a) [of ERISA], that complaint is converted from an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.

Marin Gen. Hosp. v. Modesto & Empire Traction Co., 581 F.3d 941, 945 (9th Cir. 2009) (citation and quotation marks omitted); see also Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).

Section 502(a)(1)(B) of ERISA states that "[a] civil action may be brought – (1) by a participant or beneficiary – (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B).  The crucial question in this case is whether plaintiff's claim for STD benefits is encompassed by section 502(a) of ERISA, resulting

in complete preemption and federal question jurisdiction to support defendants' removal.[6] If plaintiff's claim for STD benefits is not covered by ERISA, the court would lack subject matter jurisdiction and the case would have to be remanded to state court.

ERISA regulates "employee welfare benefit plans," which are defined to mean

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment....

29 U.S.C. § 1002(1). In this case, the Umbrella Plan and the Disability Program fall squarely within ERISA's definition of an employee welfare benefit plan, because they were established by an employer (Pacific Bell or AT&T) to provide Pacific Bell employees with certain welfare benefits, including disability benefits. Moreover, there is no serious dispute that the Disability Program is governed by formal plan documents, administered by third-party claims administrator Sedgwick, provides for comprehensive administrative procedures to file and adjudicate claims, and is otherwise held out as an ERISA plan. (See Fender Decl. Ex. B; Strutz Decl. ¶¶ 2-6.)

However, a regulation of the Secretary of Labor excludes certain "payroll practices" from the application of ERISA. Bassiri v. Xerox Corp., 463 F.3d 927, 929 (9th Cir. 2006); Alaska Airlines, Inc. v. Or. Bureau of Labor, 122 F.3d 812, 812 (9th Cir. 1997); Behjou v. Bank of America Group Benefits Program, 2012 WL 1534931, at *2 (N.D. Cal. May 1, 2012). More specifically, the "payroll practices" exemption provides that an "employee welfare benefit

---

[6] As an initial matter, plaintiff contends that he is a member of the Communication Workers of America ("CWA") union and that ERISA does not apply to union employees. (Dkt. No. 10 at 4.) To the contrary, ERISA generally applies to all employee benefit plans sponsored by an employer or employee organizations, such as unions. 29 U.S.C. § 1003(a). Furthermore, the SPD for the Disability Program specifically states that employees from Pacific Bell covered by certain collective bargaining agreements, including the CWA's collective bargaining agreement, are subject to the Disability Program. (Fender Decl. Ex. B at 8.)

8

plan" for purposes of ERISA "shall not include -- (2) Payment of an employee's *normal compensation*, *out of the employer's general assets*, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons...." 29 C.F.R. § 2510.3-1(b)(2) (emphasis added).  Thus, the payroll practices exemption would apply here if (1) the payment of STD benefits under the Disability Program qualifies as "normal compensation" *and* (2) STD benefits are paid from Pacific Bell or AT&T's general assets.

Before turning to an evaluation of these two factors, the court first addresses defendants' argument that "[a] unified ERISA plan must be considered as whole, and may not be carved out into individual components for purposes of treating an isolated component thereof as an alleged 'payroll practice.'" (Dkt. No. 13 at 7.)  Stated differently, defendants argue that the proper inquiry is whether the Umbrella Plan or Disability Program as a whole satisfies the payroll practices exemption as opposed to whether the payment of STD benefits amounts to an exempt payroll practice.

The court declines to adopt defendants' interpretation, because Ninth Circuit case law suggests that the inquiry of whether the payroll practices exemption applies is focused on the particular benefit at issue.  See, e.g., Alaska Airlines, Inc., 122 F.3d at 812 (analyzing whether employer's system for payment of sick leave was an exempt payroll practice); Bassiri, 463 F.3d at 929 (analyzing whether employer's plan for payment of long-term disability benefits was an exempt payroll practice); see also Behjou, 2012 WL 1534931, at *1 (analyzing whether employer's STD benefits payments constituted an exempt payroll practice).  This type of inquiry makes sense, because comprehensive welfare benefit plans often include diverse components such as medical, dental, vision, and life insurance benefits, some of which could never constitute payroll practices.  Given that different components of a comprehensive welfare benefit plan may be funded differently, the appropriate focus of the analysis is the particular benefit at issue.

////

Furthermore, defendants' reliance on McMahon v. Digital Equip. Corp., 162 F.3d 28 (1st Cir. 1998) is misplaced. In McMahon, the employer provided different STD plans based on the wage class of the employee. McMahon, 162 F.3d at 33. The employee plaintiff in that case argued that the employer's "Salary Continuation Plan," which covered her, was a payroll practice funded by general assets only, whereas the employer's other "Accident and Sickness Plan" was an ERISA plan funded by insurance. Id. at 36. The court ultimately found that the employer treated both plans "as two components of a single ERISA short-term benefits plan, and furthermore that benefits under both plans were partially funded by insurance and secured by a fidelity bond." Id. at 37. The court's determination that the two STD benefits plans in that case were actually funded together and effectively treated as one plan is a far cry from concluding that a court must always consider a comprehensive employee welfare benefits plan (with benefits potentially ranging from STD benefits to medical benefits and life insurance) as a whole when evaluating applicability of the payroll practices exemption. Simply put, McMahon only involved two closely related STD benefits plans and did not even address the application of the payroll practices exemption to comprehensive or umbrella employee welfare benefits plans.

Therefore, focusing on the particular benefit at issue, the court proceeds to consider whether the payment of STD benefits under the Disability Program is an exempted payroll practice, i.e. whether it both (1) constitutes "normal compensation" and (2) is paid from the employer's general assets.[7]

////

////

////

---

[7] Many of the cases cited by defendants generally describe the characteristics of a typical ERISA plan, but do not address the specific payroll practices exemption at issue here. See e.g. Day v. AT&T Disability Income Plan, 685 F.3d 848 (9th Cir. 2012); Sarraf v. Standard Ins. Co., 102 F.3d 991 (9th Cir. 1996); Bogue v. Ampex Corp., 976 F.2d 1319 (9th Cir. 1992); Cintron Parrilla v. Lilly Del Caribe, Inc., 32 F. Supp. 2d 35 (D.P.R. 1998).

Normal Compensation

To constitute "normal compensation" under the regulation, payment need only closely resemble wages or salary, and may be less than an employee's full salary. Bassiri, 463 F.3d at 932-33; Behjou, 2012 WL 1534931, at **2-3. In Bassiri, the Ninth Circuit deferred to the Department of Labor's interpretation of the term "normal compensation" as including payments of less than full salary. Bassiri, 463 F.3d at 930, 933. The court noted that the long-term disability plan of the employer in that case "more closely resembles salary: The payments come in regular paychecks, in an amount tied to the employee's salary and not to the variable performance of a fund. And, like salary, LTD Plan benefits end upon termination." Id. at 932.[8]

In this case, the payment of STD benefits has the requisite indicia of "normal compensation." Payments are tied to the employee's regular pay – according to the SPD, they replace either 50% or 100% of the employee's pay, depending on the employee's length of service with the employer and the duration of the disability leave. (Fender Decl. Ex. B at 6.) Also, STD benefits are "reduced by certain other income sources" such as California SDI. (Id. at 11, 13-14.) The SPD further provides that "[n]o Short-Term Disability Benefits are payable when wages or salary (including vacation pay or other payments during temporary absence) is payable by a Participating Company." (Id. at 13.) As such, STD benefits are clearly designed to replace the employee's regular pay.

////

---

[8] Curiously, defendants cite Bassiri v. Xerox Corp., 292 F. Supp. 2d 1212 (C.D. Cal. 2003) for the proposition that "normal compensation" requires nothing less than the employee's regular salary. (Dkt. No. 13 at 6.) However, defendants' citation is to the district court opinion, subsequently reversed by the Ninth Circuit's opinion, which is cited both in this order and in the court's previous order requiring supplemental briefing. (See Dkt. No. 12 at 6.) Moreover, although defendants suggest that the district court opinion in Bassiri was "reversed and remanded on other grounds," the Ninth Circuit's opinion indicates that the case was reversed and remanded precisely because the Ninth Circuit disagreed with the district court's conclusion that the long-term disability benefits plan at issue could not qualify as a payroll practice because it paid less than the employee's full salary. Bassiri, 463 F.3d at 934. Therefore, the court declines defendants' invitation to reject binding Ninth Circuit precedent in favor of a reversed district court opinion.

1    Furthermore, although payroll checks and STD benefits checks are authorized and
2 generated somewhat differently, they are both paid through eLink, the AT&T payroll system.
3 (Declaration of Mary Humphrey, Dkt. No. 16 ["Humphrey Decl."] ¶¶ 4-5.)  The SPD also states
4 that STD benefits are generally paid at the same time as wages or salary are paid, except that
5 arrears may be paid in a single sum.  (Fender Decl. Ex. B at 16.)  Additionally, STD benefits,
6 like wages or salary, are considered taxable income.  (Id.)

7    Finally, the SPD provides that STD benefits end when the employee is no longer
8 disabled, at the end of 52 weeks, or upon termination, whichever occurs first.  (Fender Decl.
9 Ex. B at 16.)  Although defendants point to some narrow exceptions to this rule (such as
10 termination and immediate reemployment by another participating company, payment pursuant
11 to a severance agreement, etc.) (id. at 10; Miller Decl. ¶ 7), defendants cannot seriously dispute
12 that payment of the STD benefits, like wages or salary, generally ends upon termination.

13    Therefore, applying the criteria set forth by the Ninth Circuit in Bassiri, the court
14 finds that the payment of STD benefits under the Disability Program closely resembles wages or
15 salary and, as such, constitutes "normal compensation" as that term is used in the regulation.

16    Payment from Employer's General Assets

17    A determination that payment of STD benefits under the Disability Program
18 constitutes "normal compensation" under the regulation does not end the inquiry.  To constitute
19 an exempt payroll practice, the STD benefits must also be paid out of Pacific Bell or AT&T's
20 general assets.  See 29 C.F.R. § 2510.3-1(b)(2).  This requirement of the payroll practices
21 exemption is consistent with the purposes of ERISA as explained by the United States Supreme
22 Court in Massachussetts v. Morash, 490 U.S. 107 (1989):

> In enacting ERISA, Congress' primary concern was with the
> mismanagement of funds accumulated to finance employee
> benefits and the failure to pay employees benefits from
> accumulated funds.  To that end, it established extensive reporting,
> disclosure, and fiduciary duty requirements to insure against the
> possibility that the employee's expectation of the benefit would be
> defeated through poor management by the plan administrator.

12

> Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address. If there is a danger of defeated expectations, it is no different from the danger of defeated expectations of wages for services performed-a danger Congress chose not to regulate in ERISA.

Id. at 115 (internal citation omitted).[9] Logically, if benefits are actually paid from the employer's general assets, ERISA's concerns do not come into play, because any risk of nonpayment depends on the financial health of the employer and not an ERISA fund or trust.

For purposes of the payroll practices exemption, "the critical inquiry is not whether the payment of short term disability benefits is made under the auspices of a benefit plan; rather, the salient inquiry...is *the source* from which the benefits are actually paid," i.e., whether the STD benefit payments are made from the employer's general assets or some other source, such as a separate trust fund or insurance. Behjou, 2012 WL 1534931, at *3 (citing Alaska Airlines, Inc., 122 F.3d at 814 and Bassiri, 463 F.3d at 931). To determine whether the regulation is applicable, a court must focus on the "actual methods of payment." Alaska Airlines, Inc., 122 F.3d at 814. In Alaska Airlines, Inc., the Ninth Circuit held that the airline employer's initial payment of sick leave benefits from its general assets qualified as a payroll practice under the regulation even if the employer subsequently sought reimbursement from trust assets in a separate trust fund, essentially utilizing an advance and recapture method. Id.

In this case, defendants claim that STD benefits under the Disability Program are paid from a Voluntary Employees' Beneficiary Association ("VEBA") Trust subject to ERISA.

---

[9] Defendants also argue that the payment of STD benefits under the Disability Program does not fit within Morash's interpretation of a payroll practice, because benefits are payable "only upon the occurrence of a contingency outside of the control of the employee." Morash, 490 U.S. at 115-16. But the Ninth Circuit already rejected such an argument in Bassiri: "Although benefits under the LTD Plan are available only after the employee becomes unable to work and is medically certified as disabled, these are not the kinds of contingencies Morash had in mind. Because all sick leave and medical benefits are contingent on illness, Xerox's proposed definition would obliterate the payroll practices exception at issue here. This cannot be what the Department of Labor intended and is not required by the statute." Bassiri, 463 F.3d at 932.

(Fender Decl. ¶ 5, Ex. C; Strutz Decl. ¶ 2.) However, defendants also concede that the benefits are initially paid through AT&T's payroll system, eLink, and that AT&T is subsequently reimbursed by the VEBA Trust no later than the month following payment to the claimant. (Strutz Decl. ¶ 12.) Defendants assert that this arrangement is utilized "to avoid the expense and administrative burden of duplicating the payroll system necessary to perform proper tax withholding and other deductions required from [STD] payments" and that "[d]uplicative payroll systems could also result in payment delays and inconsistencies in the treatment of deductions and withholdings." (Id.) Nevertheless, the arrangement amounts to an advance and recapture system whereby STD benefits under the Disability Program are initially paid from Pacific Bell or AT&T's general assets. Therefore, if the regulation were literally applied, the payment of STD benefits under the Disability Program would appear to constitute an exempt payroll practice.

However, the Ninth Circuit in Alaska Airlines, Inc. also suggested that courts must look at the substance of the payment procedure:

> The airline argues that this conclusion puts form over substance, and deprives the airline and its employees of ERISA coverage simply because, for convenience, the airline advances the funds for the trust. But the *substance of the airline's procedure is not necessarily one of a funded benefit program.* There is no clear relation between the amount of funds in the trust and the sick leave liability accrued by the airline's employees. When, as is sometimes the case, the trust's assets are as low as $1,000, the airline is free to advance many times that amount in sick leave payments. It can then make a large "payment" to the trust which in turn is offset by its "reimbursement," with a net cash flow of zero into or out of the trust. Under this scenario, the employee is relying on the financial health of Alaska Airlines, not that of the trust, for his or her regular sick leave payments...
>
> [U]nder Alaska Airlines' system, the employee is not paid by the fund and the fund is not maintained in a manner designed to protect employee sick pay benefits. The employee is paid by Alaska Airlines, and the payment falls exactly within the terms of the Secretary's payroll practices regulation. Applying the regulation literally to Alaska Airlines does not defeat the purposes of ERISA, because Alaska's system has more of the characteristics of an unfunded payment than of an ERISA trust fund payment. Under the repayment agreement, the airline's employees would still receive their benefits if the trust fund were mismanaged or

14

> held no assets, but they might not receive their benefits if the
> airline itself became insolvent. They depend on their employer for
> sick pay in the same way that they depend on it for wages. The
> risk of non-payment in those circumstances was viewed by *Morash*
> as lying beyond the purpose of ERISA.

Alaska Airlines, Inc., 122 F.3d at 814 (citation omitted) (emphasis added).

Here, by contrast, defendants' system of paying STD benefits does not have the characteristics of an unfunded payment. Several AT&T affiliates and subsidiaries jointly sponsor and contribute to the VEBA Trust, an irrevocable trust whose assets are used for the exclusive purpose of providing benefits pursuant to the Umbrella Plan, including the Disability Program and STD benefits. (Strutz Decl. ¶¶ 2-3.) Frost National Bank, a trust company independent of AT&T, serves as trustee and is responsible for management of the trust assets and other fiduciary duties. (Id. ¶ 10.) As noted above, Sedgwick, a company also independent of AT&T, administers and approves or denies claims for STD benefits paid from the trust. (Id. ¶ 11.) Furthermore, the VEBA Trust is operated in compliance with the requirements of ERISA, such as an annual audit by an independent auditor, preparation and filing of required forms and plan documents for the Umbrella Plan and component programs, and coverage by a 25 million dollar criminal insurance policy to protect against theft and misuse of trust assets with an ERISA endorsement to meet the ERISA bonding requirements. (Id. ¶¶ 3-6.)

More importantly, unlike the trust in Alaska Airlines, Inc., there is a clear relation between the amount of funds in the VEBA Trust and the accrued liability for benefits payments. In particular, Carl. J. Strutz, Executive Director for Investment Management with AT&T Management Services, Inc., who is responsible for oversight of the finance and compliance functions associated with AT&T employee benefit trusts, explained that:

> Aon Hewitt, an independent actuarial and consultant firm,
> calculates each year on an actuarial basis the annual contribution to
> be made by AT&T affiliates participating in the programs for the
> following year. In making its actuarial calculations, Aon Hewitt
> analyzes the level of assets in the Trust and the pattern and level of
> monthly claims and administrative fees in the most recent 12
> months. The analysis is done separately for short term and long

15

> term disability claims. Aon Hewitt's actuarial calculations are intended to maintain a funding level sufficient to cover all claims for current cases and maintain a reserve for incurred but unreported claims. This reserve is intended to cover claims of individuals who have become disabled (or otherwise incurred covered plan expenses) but not yet submitted claims or had them approved. This reserve is maintained in the Trust on a continuing basis and recalculated by Aon Hewitt each year.
>
> If claims materially exceed the aggregate contributions to the Trust, Aon Hewitt will perform an interim calculation to determine how much each participating company's contribution should be increased to ensure sufficient assets and reserves in the Trust. Contributions are not adjusted on a monthly (or more frequent) basis and the Trust is not "zeroed out." Aon Hewitt reviews the claims incurred on a quarterly basis to ensure adequate funding in the Trust. If contributions exceed claims, surplus funds accumulated in the Trust are added to reserves and carried over and used to pay future claims.
>
> Benefit payments are made on a "plan-wide" basis without regard to which employer employs...the participant. If an affiliate's contributions are insufficient to cover claims made by its own employees, Trust funds contributed by other participating employers' contributions are used to pay claims made by the affiliate's employees. Therefore, benefits due to a particular individual are not necessarily conditioned on the financial health of that employee's employer.

(Strutz Decl. ¶¶ 7-9.)

Therefore, even though Pacific Bell or AT&T technically advances payment of STD benefits for administrative convenience, the substance of the payment procedure is that of a funded benefit program. Unlike the trust fund in <u>Alaska Airlines, Inc.</u>, the VEBA Trust here does not exist primarily to reimburse Pacific Bell or AT&T for benefits paid (i.e., it does not merely serve as a de facto savings account for STD benefits payments from general assets). Furthermore, the risk of nonpayment to plaintiff does not primarily depend on the financial health of Pacific Bell or AT&T as opposed to the trust fund. As such, although STD benefits

////

////

////

under the Disability Program are initially paid from Pacific Bell or AT&T's general assets, the true source of payments is the VEBA Trust.[10]

Accordingly, the court finds that the payroll practices exemption does not apply in this case, that the payment of STD benefits under the Disability Program is covered by ERISA, that plaintiff's claim for STD benefits is therefore completely preempted by ERISA, and that this court has federal question subject matter jurisdiction over the action. As such, the action was properly removed to this court.

### Attorneys' Fees and Costs

Plaintiff requests $2,500.00 in attorneys' fees and costs, arguing that defendants improperly removed the case from state court. Plaintiff does not explain how this amount was computed or how he even incurred attorneys' fees when he is proceeding without counsel. In any event, in light of the finding that the case was properly removed, the undersigned further recommends that plaintiff's request for attorneys' fees and costs be denied.

### CONCLUSION

Accordingly, for the reasons outlined above, IT IS HEREBY RECOMMENDED that plaintiff's motion to remand the action to state court, and for an award of attorneys' fees and costs, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written

---

[10] Some unpublished opinions from federal district courts in California can be read to suggest that use of an "advance and recapture" system of payment always constitutes payment from the employer's general assets for purposes of the regulation. See e.g. Machado v. Pep Boys-Manny, Moe & Jack, Inc., 2008 WL 1986032 (C.D. Cal. May 6, 2008) (involving vacation benefits); Gilbert v. Securitas Sec. Servs. USA, Inc., 2007 WL 7648314 (C.D. Cal. Feb. 26, 2007) (involving vacation benefits). However, these unpublished cases are not binding precedent. Moreover, in both cases, unlike this case, the court found that there was no relationship between the assets in the fund/trust and the applicable plan's accruing liability for benefits, or no indication that the employer's contributions were actuarially determined. Machado, 2008 WL 1986032, at *8; Gilbert, 2007 WL 7648314, at *5.

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO RECOMMENDED.

DATED: November 16, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE